UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ADPA HOLDINGS LTD and MILAK HOLDINGS
LLC,

                         Plaintiffs,             **OPINION & ORDER**

     - against -                       No. 24-CV-6029 (CS)

RON COHEN and MICHAEL GESSER,

                         Defendants.
-------------------------------------------------------------x

<u>Appearances</u>:

Timothy J. Dennin
Timothy J. Dennin, P.C.
Northport, New York

Levi G. McCathern, II
Shane Eghbal
McCathern Shokouhi Evans
Dallas, Texas
*Counsel for Plaintiff*

John A. Basinger
Stephanie L. Denker
Saul Ewing LLP
New York, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

Before the Court is the motion to dismiss of Defendants Ron Cohen and Michael Gesser.

(ECF No. 48.)  For the following reasons, the motion is GRANTED.

## I.     <u>BACKGROUND</u>

For the purposes of the instant motion, I accept as true the facts, but not the conclusions,

set forth in Plaintiffs' Third Amended Complaint.  (ECF No. 44 ("TAC").)

A.    **Facts**

On April 1, 2024, prescription drug company Acorda Therapeutics Inc. ("Acorda") filed for bankruptcy.  (TAC ¶ 41; *see id.* ¶¶ 18, 20, 22, 30.)  Prior to the bankruptcy, Paso Milak, who is the 100% owner of Plaintiff Milak Holdings, LLC ("Milak Holdings") and the majority owner and managing partner of Plaintiff ADPA Holdings LTD ("ADPA"), was an active shareholder of Acorda, and at one point held up to 8% of its outstanding shares, likely worth over $8 million.  (*Id.* ¶¶ 10, 12.)  Milak was a diligent investor and regularly communicated with the managers and directors of Acorda, including Defendant Ron Cohen, the founder and CEO, and Defendant Michael Gesser, the CFO and Treasurer (together, "Defendants").  (*Id.* ¶¶ 8-9, 12-13.)  Milak participated in routine calls and quarterly meetings, and he was one of the only shareholders who maintained frequent personal contact with Defendant Cohen.  (*Id.* ¶ 12.)  In the years leading up to the bankruptcy, Milak repeatedly inquired as to the state of the company, its ability to meet its financial goals, and Defendants' management strategy.  (*Id.* ¶ 13.)

During a recorded phone call in May 2022, Milak asked Defendants whether Acorda was still planning to be "cashflow neutral by the end of the year," (ECF No. 49-12 ("May 2022 Call Tr.") at 11:7-13), as Defendants had previously indicated, (TAC ¶ 14).  Milak expressed his doubts as to the feasibility of achieving this goal in light of the company's slow start in the first quarter.  (*See* TAC ¶ 14; May 2022 Call Tr. at 11:7-10.)  Gesser confirmed that Acorda's management was "still aiming for that" and "tracking that way," explaining that Acorda would soon be receiving royalties from the global sales of a drug called FAMPYRA and revenues from the company's upcoming launch in Germany.  (*See* May 2022 Call Tr. at 11:14-12:11; TAC ¶ 14.)  He also explained that, while the January and February sales "were way under what [management] expected [them] to be," the company's numbers had improved in March and

April, which suggested that the drop in sales in the first quarter may have been attributable to factors such as consumers "stockpiling" drugs at the end of the prior year to account for resetting deductibles. (May 2022 Call Tr. at 15:21-16:23.)  Thus, while Gesser stated that management had been in "kind of a hold your breath kind of moment" with regard to certain drug sales in the beginning of the year, and that management anticipated a "degradation of the brand year over year," he explained that management had decided to stick to their guidance due to the fact that March and April sales were in line with what management had hoped. (*Id.* at 15:21-16:8.)

On the same call, Cohen further explained that a recent COVID surge may have led to a reduction in purchases, as consumers were seeing doctors less frequently and were less active and thus did not feel as much of a need to treat symptoms with Acorda's drugs. (*Id.* at 17:8-18:23.)  He noted that sales had rebounded significantly once the winter COVID surge had dissipated, and that management remained optimistic despite the fact that the number of COVID cases was once again on the rise, because although he could not say for sure, it appeared that the current surge would be smaller. (*Id.* at 18:24-19:10.)  He also informed Milak that management had been met with a positive reaction to their new advertising campaign, but cautioned that what they "did not anticipate was how conservative this field is, how slow the doctors are to adopt new methodologies," and that, while they were "still pushing ahead," "it takes time and multiple exposures" to introduce new drugs into the field. (*Id.* at 20:16-21:21.)  Thus, Cohen explained, Acorda was "still making progress," but more slowly than he or the rest of management wanted. (*Id.* at 21:21-23.)  After this call, Milak caused Milak Holdings to purchase 25,560 shares of Acorda and ADPA to purchase 135,441 shares between May 2022 and June 2022. (TAC ¶ 14 n.6.)

3

Plaintiffs allege that, at the time of the May 2022 call, Defendants "were aware of key internal financial reports indicating the practical impossibility of being cash flow neutral by year end." (*Id.* ¶ 14.) The TAC does not specify what these reports were or what information therein allegedly foreclosed the possibility of reaching cash flow neutrality.[1] It does point out, however, that "[f]or the quarter ending March 30, 2022, Acorda's total net revenues were $22,534,000—a shortfall more than ($6,000,000) less than the quarter ending March 30, 2021," and "[f]or the six months ending June 30, 2022, Acorda's total net revenues were $53,585,000—more than ($7,000,000) less than the six-month period ending June 30, 2021." (*Id.* ¶ 15.) Ultimately, at the end of 2022, Acorda's revenues were over $30 million short of the $150 million that the company would need to be cash flow neutral considering operating expenses. (*Id.* ¶¶ 14-15.) As Gesser later explained in his declaration in support of Acorda's Bankruptcy Petition in 2024, Acorda "was unable to adequately reduce its expenses to generate sufficient cash flow or additional capital to drive growth" despite its multiple attempts to restructure. (ECF No. 49-14 ("Gesser Decl.") ¶ 35; *see* TAC ¶ 16.)

In August 2022, Gesser stated on a call to Plaintiffs and other investors that, while the company was "aiming to be cash flow neutral by the end of the year," management now expected that that would not occur until 2023. (TAC ¶ 17.) The "Long-Term Business Plan and Financial Guidance" that shareholders received on October 28, 2022 – shortly before the Special

---

[1] Plaintiffs allege that on the call, "Gesser, who represented he was reviewing daily reports related to Acorda's relevant financials (See Gesser Transcript page 130), confirmed that Acorda was on track to [reach breakeven]." (TAC ¶ 14.) "Gesser Transcript" refers to the transcript of a deposition Gesser gave in connection with the bankruptcy. (*Id.* n.5.) Despite Plaintiff's careful and arguably misleading wording, the transcript makes clear that Gesser made no such representation on the May 2022 call. (May 2022 Call Tr.) Rather, he testified in his 2024 deposition that in 2023 he was receiving daily sales reports on the drug Inbrija. (ECF No. 56-1 at 130:10-24.)

4

Meeting of Stockholders scheduled for November 4, 2022 – indicated that management expected Acorda to be cash flow positive in 2023 if the shareholders approved a reverse stock split, which would enable the stock to continue to be listed on NASDAQ.  (*Id.*)  Between July and December 2022, Milak Holdings purchased 208,595 shares of Acorda stock and ADPA purchased 169,500 shares.  (*Id.*)

Milak and Defendants had telephonic meetings throughout 2023.  (*Id.* ¶ 18.)  On March 9, 2023, Cohen reiterated to Milak and other investors that management expected Acorda to be cash flow neutral or positive for 2023.  (*Id.*)  In another March call,[2] Milak asked Gesser and Cohen whether they realistically thought that Acorda would hit its sales projections, to which Cohen responded:  "If we didn't, we wouldn't be putting it out. . . .  We can't put out numbers that we can't justify."  (ECF No. 49-10 ("March 2023 Call Tr.") at 14:5-7; TAC ¶ 20.)  He explained that they had seen increases in prescriptions after COVID rates declined, as expected.  (March 2023 Call Tr. at 15:8-20.)  He qualified this, however, by noting that "you can only be as good as your projections" and that "there are two kinds of projections, lucky and wrong," and so it would not be possible to predict whether the increase in prescriptions would persist in the coming months.  (*Id.* at 14:10-13, 15:21-24.)  Gesser further noted that management expected its new marketing strategy to lead to "an uptick in prescriptions," which Cohen reiterated would be a "*continued* uptick in prescriptions."  (*Id.* at 17:20-18:7 (emphasis added); TAC ¶ 20.)

During this call, Milak also raised the issue of the significant debt that would become due at the end of 2024.  (March 2023 Call Tr. at 30:1-9; TAC ¶¶ 22-23.)  Cohen acknowledged that

---

[2] While the TAC refers to a May 2023 call, (*see* TAC ¶ 20), it is clear from both the content of the call and other allegations in the TAC that Plaintiffs are referring to a call that took place in March 2023, (*see id.*; ECF No. 49-10 ("March 2023 Call Tr.") at 14:2-7, 31:21-23).  Plaintiffs acknowledge in their opposition that the TAC mistakenly identified this call as taking place in May 2023 and agree that it took place in March.  (ECF No. 52 ("Ps' Opp.") at 7 n.2.)

Acorda would not be able to pay the debt off in cash, but explained that management was considering several alternative strategies, such as creating a "value proposition" sufficiently attractive to convince lenders to give the company an extension while nonetheless "preserv[ing] shareholder equity." (March 2023 Call Tr. at 30:14-31:11; TAC ¶¶ 22-23.) Cohen noted that, in addition to generating additional value attributable to the rise in prescriptions, Acorda could possibly win $65 million from a pending lawsuit. (March 2023 Call Tr. at 32:10-15.) He also assured Milak that he was in direct contact with the lenders to whom the debt was owed to discuss possible options. (*Id.* at 46:20-47:3.) Between March 8, 2023 and March 23, 2023, Milak Holdings purchased 15,000 shares of Acorda stock, allegedly in reliance on Gesser and Cohen's representations. (TAC ¶ 18.) According to Gesser's 2024 declaration, Acorda "engaged Leerink Partners as its investment banker to conduct a sale process" in April 2023, soon after the call in which Gesser and Cohen reassured Milak that they were exploring strategies that would preserve shareholder equity. (*Id.* ¶ 24; Gesser Decl. ¶ 36.) With the help of Leerink Partners, the declaration explains, Acorda "commenced a comprehensive process to market the opportunity for third parties to engage in a strategic transaction with the Company," during which Acorda "made clear to all potentially interested parties that they were receptive to any value-maximizing strategic transaction, whether in the form of a sale, restructuring, financing or otherwise, either in or out of court." (Gesser Decl. ¶¶ 38-39.)

By May 2023, however, Milak began to seriously doubt Acorda's ability to meet its financial projections, and he emailed Cohen on May 16, 2023 demanding answers as to how management planned to grow revenue, finance debt and become profitable. (TAC ¶ 19.) He made clear in the email that Plaintiffs' votes at the upcoming shareholders' meeting – during which Cohen's board seat and CEO position would be on the line – would depend on whether

Cohen could provide a clear plan as to how Acorda would address these issues.  (*Id.*)  On June 14, 2023, shortly before the annual meeting, Milak met with Cohen in person, and Cohen assured him that "due to his intimate knowledge of the Company, his relationship with the bond holders, and strategy to deal with the debt, he was the right person to continue to lead Acorda."  (*Id.* ¶ 25.)  At the meeting, Defendants allegedly concealed and made false representations about Acorda's financial status and viability as a going concern.  (*Id.*)  As of June 1, 2023, however, after Acorda made its semiannual interest payment on the notes due in December 2024, the company had used all of the restricted cash set aside for these payments and no longer had the option to pay the interest in stock; Acorda would therefore need to spend approximately $6.2 million in cash on interest payments every six months despite not having cash set aside for such payments.  (*Id.* ¶ 26.)  Between May 9, 2023 and July 31, 2023, Milak Holdings purchased 11,300 shares of Acorda stock.  (*Id.* ¶ 27.)

In July 2023, Merz Pharmaceuticals, LLC ("Merz") submitted a bid to purchase Acorda's assets.  (*Id.* ¶ 28.)  After receiving six non-binding indications of interest – and spending between $5 and $10 million per month on premarketing and sales efforts – Acorda's management determined in September 2023 that the best path forward would be a "Stalking Horse Bid" from Merz, which involved Merz purchasing all of Acorda's assets in a bankruptcy proceeding.  (*Id.*)  Defendants asked the lenders to sign non-disclosure agreements in October 2023 in order to include them in sales negotiations.  (*Id.* ¶ 37.)

On January 12, 2024, Defendants texted Milak and invited him to a telephonic meeting to discuss news about one of the drugs Acorda sold.  (*Id.* ¶ 30.)  While the deal with Merz had not yet been finalized or approved by Acorda's board, Gesser later admitted that, during this January meeting, he knew that management would recommend the asset sale to the board and that, if the

sale went through, it would wipe out all shareholder equity in the company.  (*Id.* ¶ 31; ECF No. 49-11 ("Gesser Depo. Tr.") at 154:4-155:23, 162:20-163:17.)  Thus, while Defendants and Milak discussed options for increasing revenue on the call, Defendants knew that it was doubtful that Acorda would exist as an entity by the time this revenue materialized.  (TAC ¶ 32; Gesser Depo. Tr. at 184:8-185:3.)  Nonetheless, consistent with Acorda's public statements at the time, Defendants continued to give Milak the impression that Acorda was a going concern.  (TAC ¶ 34.)  Milak – who was unaware at the time that a sale was being negotiated and likely to be approved – offered on the call to raise $10 million to assist Acorda in its negotiations with lenders regarding potential restructuring of the debt.  (*Id.* ¶ 32.)  Cohen declined Milak's offer, allegedly telling Milak that Acorda "did not need the cash and was in sound financial footing." (*Id.*)  Allegedly in reliance on Defendants' continued representations of Acorda's financial viability, Milak Holdings purchased 7,260 shares of Acorda stock during the period from January 18, 2024 through February 1, 2024.  (*Id.* ¶ 36.)

Throughout the sale negotiations, it was imperative that Acorda's stock price remained above $1 per share.  (*Id.* ¶ 39.)  Otherwise, Acorda would no longer be able to remain listed on securities exchanges, which would violate the terms of the debt covenants with the lenders, and the bankruptcy plan would collapse.  (*Id.*)  Defendants had already initiated two reverse stock-splits to keep the share price above this minimum, and would be unable to do so again without being delisted from NASDAQ.  (*Id.*)  It was therefore crucial to prevent shareholders such as Milak from selling their shares and causing the stock price to fall.  (*Id.*)

According to a 2022 proxy statement, Cohen would receive more than $3 million upon a change of control of Acorda. (*Id.* ¶ 40.)[3] Gesser represented in his May 2024 deposition in the bankruptcy proceeding that he would receive no compensation from the transaction, and Plaintiffs allege no facts suggesting otherwise. (*Id.*)

Acorda filed for bankruptcy on April 1, 2024. (*Id.* ¶ 41.) The bankruptcy caused the stock price to fall to zero and Milak to lose over $4 million. (*Id.*)[4]

### B.       **Procedural History**

On August 9, 2024, Milak filed his initial complaint against Cohen and Gesser, bringing claims for fraud, fraudulent inducement and fraudulent concealment; holder fraud; civil conspiracy; and negligence. (ECF No. 7.) He filed the First Amended Complaint on August 21, 2024, making several corrections to the initial Complaint but asserting the same claims. (ECF No. 19.)

On October 15, 2024, Defendants filed a letter requesting a conference in anticipation of their motion to dismiss. (ECF No. 32.) On November 13, 2024, Milak filed a letter requesting that the Court allow him to file a Second Amended Complaint in lieu of filing a reply letter and appearing at the conference. (ECF No. 34.) The letter explained that Defendants consented to the filing of a Second Amended Complaint in lieu of a pre-motion conference, but asked that the Court deny further leave to amend if the Second Amended Complaint failed to rectify the pleading deficiencies outlined in Defendants' pre-motion letter. (*Id.*) The Court issued an order on November 14, 2024, granting Milak leave to file a Second Amended Complaint and noting

---

[3] The TAC does not state whether the stalking-horse bankruptcy plan would constitute a change in control under the relevant agreements.

[4] It is not clear from the TAC how much of this loss was suffered by each Plaintiff company.

that another chance to amend on the issues raised in the October 15 letter would be unlikely. (ECF No. 35.)

Milak filed the Second Amended Complaint on December 12, 2024, joining ADPA and Milak Holdings as Plaintiffs and adding claims for breach of fiduciary duty and violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 issued thereunder. (ECF No. 38.) Defendants filed another pre-motion letter on January 10, 2025, restating their intent to move to dismiss and requesting a pre-motion conference. (ECF No. 39.) Milak, ADPA and Milak Holdings filed a letter in response on February 7, 2025, (ECF No. 41), and the Court held a conference on February 14, 2025 to discuss the anticipated motion, (*see* Minute Entry dated Feb. 14, 2025). At the conference, the Court granted Plaintiffs leave to file a Third Amended Complaint. (*Id.*) The TAC, which was filed on March 18, 2025, dropped Milak as a Plaintiff and dropped the holder fraud claim. (TAC.) The instant motion followed.

## II.    LEGAL STANDARD

### A.    Motion to Dismiss for Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. While Federal Rule of Civil Procedure 8 "marks a

notable and generous departure from the hypertechnical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

**B.**     **Pleading Standard for Fraud Under Rule 9(b) and the PSLRA**

In addition to the *Twombly-Iqbal* standard, fraud claims are subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard.  *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").  This standard applies equally to fraud claims based in federal law and to state-law fraud claims in federal cases. *See IKB Int'l S.A. v. Bank of Am. Corp.,* 584 F. App'x 26, 27 (2d Cir. 2014) (summary order) ("A claim for common law fraud in federal court is subject to the particularity pleading requirements of Federal Rule of Civil Procedure 9(b)."); *Brandr Grp. v. Port Auth. of N.Y. & N.J.*, No. 19-CV-974, 2020 WL 1489802, at *6 (S.D.N.Y. Mar. 26, 2020) ("[F]raudulent misrepresentation claims are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b).")  Under Rule 9(b), "[a] securities fraud complaint

11

based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

Moreover, private securities fraud claims are subject to a heightened pleading standard under the Private Securities Litigation Reform Act ("PSLRA"). *See* 15 U.S.C. § 78u-4(b). This standard is even more stringent than that of Rule 9(b). *See Okla. Firefighters Pension & Ret. Sys. v. Musk*, 779 F. Supp. 3d 396, 417 (S.D.N.Y. 2025); *Sun v. TAL Educ. Grp.*, No. 22-CV-1015, 2023 WL 6394413, at *25 (S.D.N.Y. Sept. 29, 2023). Under the PSLRA, a plaintiff alleging securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is based on information or belief, the complaint shall state with particularity all facts on which that belief is formed." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 76 (S.D.N.Y. 2015); *see Gomez v. Credit Suisse AG*, No. 22-CV-115, 2023 WL 2744415, at *6 (S.D.N.Y. Mar. 31, 2023), *aff'd*, No. 23-862-CV, 2024 WL 506240 (2d Cir. Feb. 9, 2024). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind – scienter, or intent to deceive, manipulate, or defraud – with respect to each statement or omission." *Diabat v. Credit Suisse Grp. AG*, No. 23-CV-5874, 2024 WL 4252502, at *7 (S.D.N.Y. Sept. 19, 2024); *see Sun*, 2023 WL 6394413, at *25. "To determine that an inference of scienter is strong, the court must decide whether a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Musk*, 779 F. Supp. 3d at 417; *see Diabat*, 2024 WL 4252502, at *7.

C.    **Documents Considered**

"Documents outside of the pleadings are not generally considered in the context of a motion to dismiss." *Noel v. Wal-Mart Stores, E. LP*, 764 F. App'x 17, 19 (2d Cir. 2019) (summary order).  But, in addition to considering the facts alleged in the complaint, a district court may consider

> documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.  Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint.  For a document to be considered integral to the complaint, the plaintiff must rely on the terms and effect of a document in drafting the complaint[;] mere notice or possession is not enough.  And even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document, and it must be clear that there exist no material disputed issues of fact regarding the relevance of the document.

*United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021); *see Solano v. New York*, No. 20-CV-1378, 2021 WL 4134793, at *3 (N.D.N.Y. Sept. 10, 2021); *170 Mercer LLC v. Rialto Cap. Advisors, LLC*, No. 20-CV-2496, 2021 WL 1163649, at *2 (S.D.N.Y. Mar. 25, 2021).

The Court may therefore consider the transcripts of the May 2022 and March 2023 phone calls, the Gesser declaration, and the Gesser deposition transcript, on all of which the TAC relies heavily.  (*See, e.g.*, TAC ¶ 14 (discussing the May 2022 call); *id.* ¶¶ 18, 20, 22-23 (discussing the March 2023 call); *id.* ¶¶ 28, 31-35, 40 (referring to Gesser Depo. Tr.); *id.* ¶¶ 16-17, 24, 28, 30 n.13, 39 n.15 (referring to Gesser Decl.).)  *See also Shetty v. Trivago N.V.*, 796 F. App'x 31, 34 n.6 (2d Cir. 2019) (summary order) ("[I]n assessing the Complaint's sufficiency, we consider the transcripts of earnings calls, which the Complaint relies upon and quotes heavily."); *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Ins. Co.*, No. 23-CV-8514, 2025 WL 1797219, at *5 (S.D.N.Y. June 26, 2025) ("Courts regularly consider transcripts of earnings calls as integral to

13

securities fraud complaints where plaintiffs allege a misrepresentation was made on the call.") (collecting cases); *Wade v. Kay Jewelers, Inc.*, No. 17-CV-990, 2018 WL 4440532, at *3 (D. Conn. Sept. 17, 2018) ("Though usually incorporation of 'integral' documents is applied to legal documents like contracts, I conclude that the [deposition] transcript should be considered here because of [Plaintiff's] extensive reliance on it in drafting the complaint."); *Hutchinson v. Perez*, No. 12-CV-1073, 2012 WL 5451258, at *5 (S.D.N.Y. Nov. 8, 2012) (considering declarations submitted by defendant in bankruptcy proceedings where complaint relied on it), *amended*, 2013 WL 93171 (S.D.N.Y. Jan. 8, 2013).  The Court may also consider Acorda's SEC filings.  *See ATSI Commc'ns*, 493 F.3d at 95 (in assessing a motion to dismiss, courts may consider "written instrument[s] attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit"); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 470 (S.D.N.Y. 2010) (same).

But while the Court may consider these documents as integral to the TAC, they cannot be relied on for their truth or to contradict the allegations in the TAC.  *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (courts may consider documents integral to the complaint "only to determine *what* the documents stated, and *not to prove the truth of their contents*") (emphasis in original); *Wade*, 2018 WL 4440532, at *3 ("I only consider the transcript for a limited purpose: if the complaint incorrectly quotes or paraphrases the transcript, I may consider [plaintiff's] testimony for the contents of his statements, but I may not consider [plaintiff's] deposition testimony for its truth or to contravene a statement in the amended complaint.").  In other words, where Plaintiffs rely on these documents to support their allegations, the Court may look to the full text to determine whether Plaintiffs misquoted testimony or took it out of context, or whether

14

Defendants actually disclosed information allegedly omitted.  *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808-09 (2d Cir. 1996) (allowing court on Rule 12(b)(6) motion to consider full text of document partially quoted in complaint); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71-72 (2d Cir. 1995) (allowing court on Rule 12(b)(6) motion to consider document integral to complaint that plaintiff chose not to attach or incorporate by reference).  It may not, however, rely on these documents to contradict the substance of Plaintiffs' allegations.

## III.    DISCUSSION

### A.    10b-5 Claims

Plaintiffs claim that Defendants violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 by making misleading statements as to Acorda's continued viability that enticed Milak to purchase additional Acorda stock.  (*See* TAC ¶¶ 57-59.)  To adequately state a 10b-5 claim, Plaintiffs must allege:  "(1) a material misrepresentation or omission by the defendant; (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Lefkowitz v. Synacor, Inc.*, No. 18-CV-2979, 2019 WL 4053956, at *9 (S.D.N.Y. Aug. 28, 2019), *aff'd sub nom. Shreiber v. Synacor, Inc*, 832 F. App'x 54 (2d Cir. 2020) (summary order); *see Am. Signature, Inc. v. Moody's Invs. Servs., Inc.*, 698 F. Supp. 3d 628, 638 (S.D.N.Y. 2023).

#### 1.    Forward-Looking Statements

The first statements Plaintiffs cite in support of their claims are those that Defendants made during their call with Milak in May 2022.  (*See* TAC ¶¶ 14-16.)  Specifically, Plaintiffs argue that Gesser, who purportedly was reviewing daily financial reports, (*see* note 1 above),

fraudulently stated that Acorda was still "aiming for" and "tracking" toward its stated goal of being cash flow neutral by the end of the year, (TAC ¶ 14). According to Plaintiffs, "Defendants Cohen and Gesser were aware of key internal financial reports indicating the practical impossibility of being cash flow neutral by year end." (*Id.*) In support of this contention, Plaintiffs do not identify any such reports but point out that (1) Acorda's total net revenues for the quarter ending in March 2022 and for the six months ending in June 2022 were significantly lower than the previous year; (2) Acorda's net loss for the six-month period ending in June 2022 was far higher than the previous year; and (3) Acorda did not ultimately achieve cash flow neutrality by the end of the year. (*Id.* ¶¶ 14-15.)

Plaintiffs also point to statements made in August 2022 and October 2022, in which Defendants made similar projections as to the company's financial progress. (*See id.* ¶ 17 ("On a call to Plaintiffs and investors in August 2022, Defendant Gesser stated: '[A]lthough we were aiming to be cash flow neutral by the end of the year, we now anticipate that will occur in 2023.'"); *id.* (Acorda released guidance to shareholders in October 2022 representing that Acorda "expect[ed] to be cash flow positive in 2023").)

Plaintiffs rely on similar statements made telephonically throughout 2023 relating to Acorda's ability to be cash flow neutral or positive by the end of the year. (*Id.* ¶¶ 18-20.) They specifically rely on the recorded call from March 2023, during which Defendants assured Milak that they would not publish projections that they could not justify and predicted that "expenses would decrease and revenues would increase as the year progressed." (*Id.* ¶ 20.) Plaintiffs highlight that, as reflected in Acorda's 2023 10-K, the company's end-of-year revenues were far short of Defendants' predictions. (*Id.*)

These allegations are deficient in several respects.

a.       PSLRA Safe Harbor

First, "[e]xpressions of optimism and projections about the future" – such as statements that a company is "on track" – are merely forward-looking statements protected under the PSLRA. *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 226-27 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019) (summary order); *see In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 210 (S.D.N.Y. 2022) (Defendant's "statements that the project was 'on track'" qualified as forward-looking statements under the PSLRA); *In re Adient plc Sec. Litig.*, No. 18-CV-9116, 2020 WL 1644018, at *17, 19 (S.D.N.Y. Apr. 2, 2020) ("Defendants' statements about what they 'think,' 'believe,' and 'expect' to occur in the future" – including their statement that company was "on track" to meet projections – were "inactionable statements of opinion or belief"); *In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16-CV-7840, 2018 WL 2081859, at *12 (S.D.N.Y. Mar. 30, 2018) (statement that company "remain[ed] on track to deliver adjusted EBITDA in line with expectations" was forward-looking), *aff'd*, 764 F. App'x 127 (2d Cir. 2019) (summary order).[5]  Such statements are covered by the "safe harbor" provision of the PSLRA, which provides that liability does not attach for forward-looking statements if "(1) the forward-looking statement is identified as such and accompanied by meaningful cautionary statements, or (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove

---

[5] While Plaintiffs baldly assert that "Defendants' misrepresentations detailed above are contemporaneously contradicted by known facts and thus do not fall into the category of forward-looking statements or puffery protected under the PSLRA," (Ps' Opp. at 20), they do not specify the "known facts" that allegedly contradicted Defendants' statements.  Moreover, even when a forward-looking statement necessarily relies on present facts, when the statement "does not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection."  *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *19 (collecting cases).

that the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading." *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *18 (citing 15 U.S.C. § 78u-5(c)(1)(A)-(B)); *see Lefkowitz*, 2019 WL 4053956, at *9. "As the Second Circuit has noted, the safe harbor is written in the disjunctive, meaning that a defendant is not liable if *any* of these provisions apply." *In re WEBMD Health Corp. Sec. Litig.*, No. 11-CV-5382, 2013 WL 64511, at *4 (S.D.N.Y. Jan. 2, 2013) (emphasis in original) (citing *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010)). Defendants' forward-looking statements are shielded from liability under at least the first and third provisions.

As to the first provision, "[a] defendant who publishes a forward-looking statement is protected against liability in a private action under the federal securities laws if that statement is accompanied by meaningful cautionary language." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 392 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (summary order); *see In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 213. "To be meaningful, the cautionary language need not directly precede or follow the forward-looking statement." *In re Turquoise Hill*, 625 F. Supp. 3d at 213; *see Gray*, 454 F. Supp. 3d at 392. While boilerplate warnings and vague disclosures do not suffice as meaningful cautionary language, defendants will be shielded from liability so long as their statements "convey[ed] substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement." *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *18; *see Slayton*, 604 F.3d 758 at 771.

While Gesser represented during the May 2022 call that Acorda was "tracking" to meet its financial projections, Defendants made clear throughout the remainder of the call that there were numerous factors that could result in Acorda failing to achieve this goal. Gesser

18

specifically conceded that the January and February sales had been disappointing, and Cohen explained both the impact of COVID on drug sales and the significant time it could take to introduce a new drug into the market, even admitting that Acorda's progress thus far had not been at pace with what management had hoped.  (May 2022 Call Tr. at 11:14-21:23.)  Indeed, Defendants' explanation of the factors behind the shifting sales numbers and the way those factors could continue to impact sales moving forward was far *more* substantive than Gesser's vague statement that Acorda was still "aiming for" cash flow neutrality.  Defendants' optimistic statements in 2023 were similarly tempered, with Cohen specifically warning Milak that, while management had been encouraged by a recent uptick in sales, projections are never a guarantee, and the company could not know for certain that the uptick would continue throughout the remainder of the year.  (*See* March 2023 Call Tr. at 14:10-13, 15:21-24.)[6]

Nor do Plaintiffs provide any facts from which the Court could infer that Defendants had actual knowledge that their statements were false or misleading when made.  Plaintiffs point to Acorda's ultimate inability to reach cash flow neutrality in 2022 and 2023 to argue that Defendants could not have believed that Acorda was actually on track to achieve this goal.  (TAC ¶¶ 15, 20.)  But given that "the Second Circuit has firmly rejected the 'fraud by hindsight' approach[,] it is not sufficient for [the purposes of a fraud claim] to allege that an opinion was unreasonable, irrational, excessively optimistic, or not borne out by subsequent events."  *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *15; *see Diabat*, 2024 WL 4252502, at *13 ("The

---

[6] Although it is not clear whether the October 2022 statement that Acorda "expect[ed] to be cash flow positive in 2023," (TAC ¶ 17), or the March 2023 statement that Acorda "expect[ed] to be cash flow neutral or positive for 2023," (*id.* ¶ 18), were accompanied by cautionary language, as the Court does not have a transcript or other document placing these statements in context, they are nonetheless protected under the third provision, as discussed below, because Plaintiffs have not alleged any facts showing that the statements were knowingly false when made.

19

very fact that Plaintiff asserts that something would not happen *in the future* to justify his contention that these disclosures were false and misleading demonstrates that the allegation is pure fraud by hindsight – which cannot support a 10(b) claim." (emphasis in original)); *In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 232-33 (S.D.N.Y. 2021) (defendants' awareness of company's financial difficulties did not demonstrate actual knowledge that future financial target was unattainable); *Lefkowitz*, 2019 WL 4053956, at *9 (allegations that "the projections [were] unrealistic are not tantamount to Defendants' knowledge that the projections were false"). Defendants' statements of optimism regarding Acorda's ability to meet its financial goals thus fall within the PSLRA safe harbor and cannot subject them to liability.[7]

> b.      Reliance

Plaintiffs' allegations as to Defendants' forward-looking statements also fail to plausibly meet the reliance prong of a 10b-5 claim.  In order to satisfy this requirement, a plaintiff must show that reliance on the alleged misrepresentation was reasonable.  *See Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 337 (2d Cir. 2011); *Tecku v. Yieldstreet, Inc.*, No. 20-CV-7327, 2022 WL 1322231, at *13 (S.D.N.Y. May 3, 2022).  In assessing reasonableness, courts consider factors such as:

---

[7] As discussed more fully below, the fact that Defendants had begun to plan for a potential bankruptcy does not alone render their forward-looking statements misleading, let alone demonstrate that Defendants had actual knowledge that their statements were false, particularly given the positive trends in sales to which Defendants pointed as the source of their optimism. *See In re Garrett Motion Inc. Sec. Litig.*, No. 20-CV-7992, 2023 WL 2744029, at *20 (S.D.N.Y. Mar. 31, 2023) (not misleading to make "optimistic statements while in the final stages of due diligence with a potential stalking horse bidder" where bankruptcy was not yet certain), *aff'd sub nom. Gabelli Asset Fund v. Garrett Motion Inc.*, No. 23-668-CV, 2024 WL 1653451 (2d Cir. Apr. 17, 2024); *see also In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *17 ("That [the company] was experiencing challenges does not mean that Defendants' expectations of still achieving certain improvements in [the company] and/or [its] goal[s] were false or unreasonably held.").

(1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Ashland Inc.*, 652 F.3d at 338.

It is not plausible that Milak, who is a sophisticated investor, (*see* TAC ¶ 12 (describing Milak as a "significant, active shareholder")), could have reasonably relied on Defendants' statements regarding their expectations as to Acorda's financial goals.  Even though Milak and Defendants allegedly maintained a close business relationship, general statements that Acorda was "aiming" for or "tracking" toward meeting its financial goals are too general and vague to justify reliance.  *See In re Micro Focus Int'l Plc Sec. Litig.*, No. 18-CV-6763, 2020 WL 5817275, at *5 (S.D.N.Y. Sept. 29, 2020) ("Rosy predictions, or statements that are loosely optimistic regarding a company's well-being, have been found" to be "too general to cause a reasonable investor to rely upon them," particularly "where the statements are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'"); *see also In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 502 (E.D.N.Y. 2025) ("broad statements about a company's 'remarkable progress towards its stated goal' or that the company is 'confident about and prepared for what lays ahead'" were "too general to cause a reasonable investor to rely upon them"); *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *22 (statements regarding "what Defendants 'expected' to see, what they 'felt confident' about, and what they were 'comfortable' with" were "too general for a reasonable investor to have relied on them").

Moreover, "[i]t is axiomatic that a securities fraud claim does not lie when the company disclosed the very risks about which plaintiffs claim to have been misled."  *In re Meta Materials Inc. Sec. Litig.*, No. 21-CV-7203, 2023 WL 6385563, at *15 (E.D.N.Y. Sept. 29, 2023); *see In re*

21

*Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 536 (S.D.N.Y. 2012) (investor

"may not justifiably rely on a misrepresentation if, through minimal diligence, the investor

should have discovered the truth"), *aff'd sub nom. La. Pac. Corp. v. Merrill Lynch & Co.*, 571 F.

App'x 8 (2d Cir. 2014) (summary order); *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 553 (S.D.N.Y.

2021) ("Where allegedly undisclosed material information is in fact readily accessible in the

public domain, a defendant may not be held liable for failing to disclose this information."). 

Much of the information that allegedly rendered Defendants' statements misleading was either

publicly available, directly communicated to Milak by Defendants, or both.[8]

Acorda's 2021 10-K – which was filed in March 2022, two months before the May 2022

call – specifically noted that Acorda had "a history of operating losses and may not be able to

achieve or sustain profitability in the future."  (*See* ECF No. 49-1 at 28.)  The 10-K further

warned investors that Acorda's "prospects for achieving and sustaining profitability in the future

will depend primarily on how successful we are in increasing Inbrija (levodopa inhalation

powder) sales . . . as well as the extent and timing of expected continuing Ampyra sales declines

due to generic competition that commenced in 2018." (*Id.*)  The importance of the success of

Inbrija and Ampyra (two of the primary drugs sold by Acorda) to the company's financial

viability was again highlighted by Defendants during the May 2022 call, during which

Defendants also explained some of the factors that could influence these sales, as discussed

above.  And Defendants informed Milak that sales numbers for the beginning of the first quarter

had been disappointing – information that Milak seemingly already knew.  (*See* May 2022 Call

---

[8] This principle can also be framed in terms of the materiality of Defendants' alleged misrepresentations:  "[a]lleged misstatements are not material where the truth was fully disclosed or concerned a matter of public knowledge."  *Lau*, 527 F. Supp. 3d at 553; *see In re Meta,* 2023 WL 6385563, at *15 ("The issue can be described in terms of materiality because additional disclosures would not alter the total mix of information available to a reasonable investor.").

Tr. at 11:9-10 (Milak told Defendants that he was doubtful Acorda could reach cash flow neutrality in 2022 "given how slow Q1 has started").)  Additionally, while it is not clear exactly when in May the May 2022 call took place, Acorda publicly disclosed its revenues for the first quarter of 2022 in the 10-Q filed with the SEC on May 13, 2022.  (ECF No. 49-2.)  As such, for at least most of the period of May 2022 through June 2022 during which Plaintiffs allegedly purchased thousands of shares, Milak was aware of the same figures that he now alleges rendered Defendants' representations misleading.  (*See* TAC ¶ 15 (relying on Acorda's first quarter revenues).)

Acorda's subsequent SEC filings continued to illustrate Acorda's financial peril.  Indeed, the 10-Q Acorda filed on November 14, 2022 disclosed that "[i]nterest on the 2024 Notes is payable semi-annually in arrears at a rate of 6.00% per annum on each June 1 and December 1," and that "[b]ased on the current market price of the Company's common stock and the Company's remaining authorized shares of common stock that are not reserved for other purposes, the Company believes that for the foreseeable future interest payments on the 2024 notes will have to be made in cash."  (ECF No. 49-4 at 18, 38.)  The 10-Q explained that Acorda had "$12.4 million of restricted cash . . . currently held in escrow under the terms of its convertible senior secured notes due 2024" and that the principal amount of the notes was "approximately $207.0 million."  (*Id.* at 9, 18.)  This information was reiterated after the December 2022 interest payment had been made, in the 2022 10-K Acorda filed on March 15, 2023, which noted that the amount of restricted cash was now only $6.2 million.  (ECF No. 49-13 at 3.)  Thus, while the TAC describes as "[u]nbeknownst to Plaintiffs" the fact that following the June 1, 2023 interest payment "the Company no longer had the option to pay the interest in stock" and "had fully utilized the restricted cash that was set aside for the payment of the interest

23

on the 2024 Notes," (TAC ¶ 26), a review of the company's disclosures in the prior months would have provided notice of these facts.

Thus, it appears that Milak, like Defendants, had access to information signaling that Acorda was struggling and nonetheless chose to be optimistic about the company's future based on certain positive sales trends. He cannot impose liability on Defendants simply because their collective optimism turned out to be misplaced.

### c.    Scienter

Finally, for all of the statements discussed above, Plaintiffs have failed to plausibly allege scienter. Under the PSLRA, "[a] plaintiff may satisfy the scienter requirement by alleging facts that either: (1) show that the defendants had both motive and opportunity to commit the fraud; or (2) constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Hutchinson*, 2012 WL 5451258, at *4; *see In re Garrett Motion Inc. Sec. Litig.*, 2023 WL 2744029, at *10.

Plaintiffs point to the compensation Cohen would allegedly receive upon a change in control of Acorda as evidence of his motive to deceive Milak. (TAC ¶ 40.) While Plaintiffs acknowledge Gesser's testimony that he would not receive any financial benefit from the Merz transaction and do not allege any facts to contradict this testimony, they nonetheless contend that "discovery must be conducted to determine (1) the veracity of this claim and (2) what compensation, if any, Gesser received in any other capacity as a result of the Merz transaction." (*Id.*) But "as *Iqbal* makes clear, a plausible claim must come *before* discovery, not the other way around." *Angiulo v. Cnty. of Westchester*, No. 11-CV-7823, 2012 WL 5278523, at *3 n.4 (S.D.N.Y. Oct. 25, 2012) (emphasis in original) (citing *Iqbal,* 556 U.S. at 678-79). And in any event, "motives possessed by virtually all corporate insiders," such as "the desire to maintain a

high stock price in order to increase executive compensation or prolong the benefits of holding

corporate office," are insufficient to satisfy the first prong. *Novak v. Kasaks*, 216 F.3d 300, 307

(2d Cir. 2000). Rather, the facts alleged must demonstrate "that defendants benefitted in some

concrete and personal way from the purported fraud," such as by profiting from insider sales. *Id.*

at 307-08. Allegations that defendants were motivated by the desire to protect "lucrative

compensation provisions" or "change of control payments" in a corporate sale are "too

generalized to support scienter adequately." *Kalnit v. Eichler*, 264 F.3d 131, 139-40 (2d Cir.

2001); *see In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 480 (S.D.N.Y. 2008) ("[W]e see no

reason why the [defendants'] change-of-control agreements would save plaintiffs' allegations

from the ordinary rule that a desire to maintain or increase executive compensation, imputable to

all corporate officers, is insufficient."); *see also No. 84 Emp.-Teamster Joint Council Pension Tr.

Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) ("'golden parachute'

argument" based on change in control provisions of executives' employment agreements "too

generalized to establish scienter"); *Manger v. Leapfrog Enters., Inc.*, 229 F. Supp. 3d 1126, 1135

(N.D. Cal. 2017) ("[T]he change-of-control allegations are insufficient by themselves to make a

strong inference of scienter."). Plaintiffs' arguments regarding Cohen's change-of-control bonus

– let alone their hypothetical allegations as to Gesser – are therefore insufficient to establish

motive.

"Absent a showing of motive, plaintiffs may demonstrate scienter through allegations

regarding conscious misbehavior or recklessness, but the strength of the circumstantial

allegations must be correspondingly greater." *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at

*26. "This high standard may be met where defendants knew facts or had access to information

suggesting that their public statements were not accurate or failed to check information they had

25

a duty to monitor," but plaintiffs "must specifically allege defendants' knowledge of facts or access to information contradicting their public statements and specifically identify the reports or statements containing this information." *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10-CV-975, 2012 WL 1646888, at \*26 (S.D.N.Y. May 10, 2012); *see In re Salix Pharms., Ltd.*, No. 14-CV-8925, 2016 WL 1629341, at \*13 (S.D.N.Y. Apr. 22, 2016). "In such situations, the scienter analysis and the determination of whether the defendant made false or misleading statements are essentially combined." *Coronel v. Quanta Cap. Holdings Ltd.*, No. 07-CV-1405, 2009 WL 174656, at \*26 (S.D.N.Y. Jan. 26, 2009); *see In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at \*26.

Plaintiffs' allegation that Gesser was "reviewing daily reports related to Acorda's relevant financials," (TAC ¶ 14), is insufficient to establish a strong inference of scienter. As noted above, that allegation is based on no more than Gesser's 2024 statement that he reviewed daily reports of Inbrija sales in 2023. (*See* note 1 above.) In any event, "vague and general averments" that defendants "had access to internal corporate documents and data" that contradicted public statements are insufficient to state a claim absent specific allegations "identify[ing] the reports or statements containing this information," *Inter-Loc. Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) (summary order), including "who prepared them and when, how firm the numbers were or which company officers reviewed them," *In re GOL Linhas Aereas Inteligentes S.A. Sec. Litig.*, 598 F. Supp. 3d 63, 70 (E.D.N.Y. 2022); *see San Leandro Emergency Med. Grp. Profit Sharing Plan*, 75 F.3d at 812-13. Plaintiffs provide no details about the nature or contents of any reports allegedly provided to Gesser. The Court cannot infer that the information to which Gesser was privy contradicted what Defendants represented to Milak – namely, that they were optimistic about certain upward trends in Acorda's

26

sales despite the company's overall financial difficulties. *See Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) (access to daily reports does not provide "strong circumstantial evidence of recklessness" where "the complaint fails to specify exactly what information was contained in the report or how said information contradicted Defendants' public statements, as is required to show scienter"). And for the various reasons explicitly set out by Defendants in their public disclosures and various calls with Milak – including the reduction in COVID numbers, the likelihood that customers who had "stockpiled" at the end of 2021 would soon return to purchase more drugs, Acorda's new advertising campaign, and so forth – the Court has no basis, apart from Plaintiffs' generic fraud-by-hindsight allegations, to infer that Defendants did not believe at the time of their optimistic statements that Acorda would be able to meet its financial goals.[9]

## 2.    Failure to Disclose Bankruptcy Planning

In addition to taking issue with Defendants' statements about Acorda's ability to reach its financial goals, Plaintiffs also assert that Defendants misled Milak about Acorda's future as a going concern. First, Plaintiffs highlight Defendants' 2023 statements regarding managements' strategies for tackling Acorda's debt, which indicated that they were seeking to "preserve shareholder equity." (TAC ¶¶ 22-23.) Plaintiffs claim that "[t]hese statements were purely false representations disguised as purported strategies when they were made because Defendants were

---

[9] Given that Gesser's access to internal reports does not even support an inference of scienter under the more lenient recklessness standard, it would clearly be insufficient to establish the "actual knowledge" required for forward-looking statements under the PSLRA. *See In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *18 ("The PSLRA safe harbor also specifies an 'actual knowledge' standard for forward-looking statements, which means that the scienter requirement for forward-looking statements is stricter than for statements of current fact."); *Hutchinson*, 2012 WL 5451258, at *8 (explaining that the Court's finding that plaintiff had failed to allege even recklessness necessarily doomed his claims asserting liability for forward-looking statements, which require proof of actual knowledge).

27

already implementing their plans to cash out for themselves and bankrupt Acorda, not refinance its debt and grow its value." (*Id.* ¶ 23.) To support this argument, Plaintiffs cite Gesser's declaration, which states that Acorda "engaged Leerink Partners as its investment banker to conduct a sale process" in 2023. (*Id.* ¶ 24.)

Plaintiffs also allege that Defendants "deliberately concealed the status of Acorda's financial desperation and imminent bankruptcy and made false representations affirming the financial viability of Acorda as a going concern" during a shareholder meeting in June 2023. (*Id.* ¶ 25.) Plaintiffs do not specify what allegedly misleading statements were made during this shareholder meeting, but they stress that the meeting took place soon after Acorda made an interest payment that utilized the remainder of the company's cash reserved for such payments. (*Id.* ¶ 26.)

But as with the other statements with which they take issue, Plaintiffs have failed to allege sufficient facts to demonstrate that Defendants' statements were false or misleading when made, relying only on hindsight and *post hoc* testimony taken out of context. First, Plaintiffs rely on Gesser's bankruptcy declaration to show that Defendants never actually intended to explore other strategies to preserve shareholder equity, as it states that Leerink Partners was engaged "to conduct a sale process" in April 2023. (*Id.* ¶ 24; Gesser Decl. ¶ 36.) But the same paragraph of Gesser's declaration states that Acorda also engaged Baker & McKenzie LLP in July 2023 "to assist management with its legal review of strategic alternatives," and that "the Company, with the assistance of outside legal and financial advisors, [had] engaged in a robust process to explore strategic alternatives and maximize value for all stakeholders in light of the upcoming maturity of the 2024 Notes." (Gesser Decl. ¶ 36.) Thus, Plaintiffs' only allegations in support of their contention that Defendants' statements regarding pursuing strategic alternatives

28

were false rely on a declaration that, when read as a whole, actually mirrors and reinforces these statements.

Plaintiffs also claim that Defendants misled Milak during a telephonic meeting in January 2024, during which Defendants allegedly informed Milak about "an ostensible strategy which would increase Acorda's revenues and restructure its debt" and indicated that Acorda would be receiving revenue from certain drug sales in January 2025, despite knowing that Acorda would soon file for bankruptcy.  (TAC ¶¶ 30, 32.)  Plaintiffs allege that Gesser's testimony in his 2024 deposition proves that Defendants' statements during this call were false when made.  (*Id.* ¶¶ 31-32.)

But while the cherry-picked portions of Gesser's deposition testimony cited by Plaintiffs in the TAC may suggest that Milak was misled during the January 2024 meeting, reading Gesser's statements in the context in which they were made – which, as discussed above, the Court is empowered to do given that the deposition testimony is integral to the TAC – demonstrates that Plaintiffs are once more attempting to allege fraud by hindsight.  Plaintiffs highlight that, when asked whether he knew that the "recommended plan was going to be the asset sale . . . prior to having the January 18 meeting," Gesser responded in the affirmative.  (*Id.* ¶ 31; Gesser Depo. Tr. at 163:11-17.)  The surrounding testimony, however, clarifies that while Gesser knew that the asset sale would be recommended to the board, management was still working with Merz to finalize the transaction and did not know whether it would ultimately culminate in a sale, (Gesser Depo. Tr. at 162:8-19); had discussed conducting a whole company sale with Merz rather than an asset sale, (*id.* at 163:3-10); and had no guarantees, at the time of the January 2024 call, that the deal would not fall apart, (*id.* at 167:4-8).  Indeed, Gesser testified

29

that the Board did not approve the sale with Merz until March 2024, well after the January 2024 call with Milak.  (*Id.* at 155:8-23.)

Courts in the Second Circuit have held that statements reflecting a company's pursuit of strategic alternatives or future income streams are not misleading where the company is likely to sell its assets in a bankruptcy proceeding but has not yet finalized the sale.  *See In re Garrett Motion Inc. Sec. Litig.*, 2023 WL 2744029, at *20 (not misleading for company to announce that it was "exploring alternatives for addressing its previously disclosed balance sheet concerns" and that its "core business remain[ed] strong," despite the fact that it had already entered into exclusivity agreement with stalking horse purchaser and signed purchase agreement less than a month later); *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007) (statements made in the month before bankruptcy filing regarding company's pursuit of options for easing liquidity problems were not misleading for failure to mention bankruptcy planning), *overruled in part on other grounds by Stoneridge Inv. Partners, LLC v. Sci.-Atlanta Inc.*, 552 U.S. 148 (2008); *see also Beleson v. Schwartz*, 599 F. Supp. 2d 519, 522-23, 525-27 (S.D.N.Y. 2009) (public statements made in July that company was "on plan" to reach financial target and had recently "won a contract" were not misleading for failure to disclose bankruptcy planning even though company filed for bankruptcy later that same month and had advised creditor and arbitration adversary in June that they should assume company would file for bankruptcy), *aff'd*, 419 F. App'x 38 (2d Cir. 2011) (summary order) (failure to disclose bankruptcy planning was immaterial because "the market was adequately informed of the dire nature of [the company's] financial condition" and the "sale and resulting bankruptcy were not finalized until immediately before they were publicly announced").

In so holding, courts have recognized that there is "a sound policy basis . . . for not requiring immediate disclosure when a company is contemplating bankruptcy." *In re Garrett Motion Inc. Sec. Litig.*, 2023 WL 2744029, at *21; *see Hutchinson*, 2012 WL 5451258, at *8 (there are "public policy justifications for allowing a company operating near insolvency to make careful deliberations about its future, free from any obligation to disclose potential bankruptcy"); *Beleson*, 599 F. Supp. 2d at 527 ("Any standard mandating disclosure of contingent bankruptcy planning would put an unacceptable burden on corporations and their officers," as it "might amount to a self-fulfilling prophecy, ensuring that all companies that begin contingent preparations for bankruptcy would inevitably go bankrupt because, upon disclosure of the plans, investors would immediately lose confidence in the company and close the capital markets."); *see also In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d at 348 ("No multi-billion dollar company would file for bankruptcy without first engaging in internal deliberations regarding its course of action . . . ."). Thus, Defendants' failure to disclose to Milak that they were planning to recommend an asset sale to the board did not render their discussion of possible future income streams or strategic alternatives misleading, as Defendants had made clear in past discussions and disclosures that Acorda was in financial peril and because there had been no final decision as to whether the Merz negotiations would culminate in a sale.[10] "A corporation is not required to

---

[10] This conclusion is bolstered by the fact that, like the statements addressed above, Defendants' discussion of the January 2025 sales was undisputably forward-looking. (*See* TAC ¶ 30 (Defendants allegedly "set up a fake call to discuss completely false, forward-looking plans").) Defendants therefore cannot be held liable for these statements absent actual knowledge that they were false. *See In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *18. While Plaintiffs insist that "Defendants knew they were filing for bankruptcy on behalf of Acorda" at the time of the call, (TAC ¶ 30), the only facts they allege in support of this conclusion are based on Gesser's deposition testimony – which, as discussed above, indicates that management recommended the asset sale but had no way to be sure that the transaction would materialize.

disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).

Plaintiffs also cite the portion of Gesser's testimony where he conceded that Acorda would be an "empty shell" by the time it could expect to receive the revenue discussed in the January 2024 meeting. (TAC ¶ 32; Gesser Depo. Tr. at 184:12-185:3.) But again, it is clear from the surrounding testimony that Gesser was not saying that he knew at the time of the January meeting that Acorda would be a so-called "empty shell," but was rather acknowledging in hindsight that that would have been the case. (*See* Gesser Depo. Tr. at 183:13-19 (when asked whether he "knew that Acorda was never going to see any revenue from Fampyra because it did not exist anymore," Gesser responded that he "didn't know that because the deal had not been concluded"); *id.* at 167:4-8 ("While we were running the company, as we had been, we had no definitive deal. We had made no announcement. The deal could have fallen apart.").) While management's negotiations with Merz may have raised doubts about whether Acorda would remain a going concern, it was not misleading for Defendants to discuss possible future revenue streams without disclosing a bankruptcy that was still, at that point, "not necessarily imminent." *In re Garrett Motion Inc. Sec. Litig.*, 2023 WL 2744029, at *20.[11]

Plaintiffs also allege, based on Gesser's deposition testimony, that Milak was "misled to believe that Acorda was a going concern and there was no likely sale of the Company in the future." (TAC ¶ 34.) First, this allegation fails to satisfy Rule 9(b)'s requirement that plaintiffs

---

[11] Indeed, if Defendants had told Milak during the January 2024 call that Acorda had been engaged in bankruptcy negotiations, they would have been providing him with material nonpublic information and would have been forced to make a simultaneous public disclosure of the same information, *see Sec. & Exch. Comm'n v. AT&T, Inc.*, 626 F. Supp. 3d 703, 759 (S.D.N.Y. 2022), which may have destroyed any chance of the deal going through and thus ultimately harmed the company.

32

"specify the statements that the plaintiff contends were fraudulent" and "identify the speaker."

*ATSI Commc'ns, Inc.*, 493 F.3d at 99.  And while Gesser admitted in his deposition that that was

the impression with which Defendants left Milak during the meeting, Gesser did not testify (and

Plaintiffs do not allege) that he ever *told* Milak that a sale was unlikely; rather, he simply did not

mention anything about the sale or marketing process because such information had not yet been

conveyed to the public, and instead conveyed, consistent with its public position, that the

company was doing everything possible to deal with the upcoming debt cliff.  (Gesser Depo. Tr.

at 180:13-183:9.)  Thus, absent any further allegations specifically identifying a misleading

statement, it appears that Plaintiffs' allegations as to this testimony simply restate their argument

that any discussion of future plans absent disclosure of the bankruptcy negotiations was

misleading, an argument which fails for the reasons discussed above.  Plaintiffs' 10(b) and 10b-5

claims are therefore dismissed.[12]

---

[12] Relying on Gesser's deposition testimony, Plaintiffs allege that Milak offered to raise $10 million for Acorda to facilitate negotiations with the lenders about restructuring the debt, (TAC ¶ 32 ("During the January 2024 meeting, Plaintiffs offered to raise $10 Million to assist the Company in its negotiations to restructure the debt due to the Note holders. (Gesser Tr. Pg. 157).").  They further allege that "Cohen responded that the Company did not need the cash and was in sound financial footing." (*Id.*)  Portions of Gesser's testimony raise doubt as to Plaintiff's description of Cohen's comment.  According to Gesser, Defendants did not tell Milak that the company did not need money, but rather thought that the logistics of Milak's proposed investment strategy could be detrimental to shareholders.  (Gesser Depo. Tr. at 168:8-170:18.)  As discussed above, however, the Court only relies on Gesser's deposition to determine whether Plaintiffs cite certain statements out of context or otherwise misrepresent the testimony – it does not rely on Gesser's statements for their truth or to contradict the substantive allegations in the TAC.  *See Wade*, 2018 WL 4440532, at *3.

Nonetheless, Plaintiffs' attempt to rely on this statement in support of their claim fails.  It may have meant nothing more than that an extra $10 million was not going to make a difference in the negotiations with lenders who were owed $200 million.  But assuming it was misleading, and while this statement, unlike the majority of the statements with which Plaintiffs take issue, involves the present financial health of the company rather than future predictions, it is not plausible that Milak could have reasonably relied on it.  As discussed above, Defendants had repeatedly disclosed, and Milak was clearly aware of, Acorda's financial woes, significant debt and upcoming payment deadline.  No reasonable investor – let alone a sophisticated investor like

### B.    Common Law Fraud

In addition to their fraud claims under the federal securities laws, Plaintiffs also assert claims under New York law for fraud, fraudulent inducement, and fraudulent concealment. (TAC ¶¶ 42-48.)[13]  Under New York law, "[t]he required elements of a common-law fraud claim are a misrepresentation or a material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury."  *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 31 N.Y.3d 569, 578-79 (2018).  "The elements of common law fraud thus are largely the same as those of a Rule 10b-5 claim except that there is no requirement that the fraud be 'in connection with the purchase or sale of securities.'"  *Grant v. Ursula Mgmt., LLC*, No. 20-CV-2953, 2021 WL 8382243, at *7 (E.D.N.Y. Oct. 6, 2021); *see Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc.*, 898 F. Supp. 2d 673, 696 (S.D.N.Y. 2012) ("The elements of common law fraud are substantially identical to the elements of a Section 10(b) claim."), *aff'd*, 548 F. App'x 16 (2d Cir. 2013) (summary order). Plaintiffs' common law fraud claims therefore fail for several of the reasons discussed above, including Plaintiffs' failure to show that Defendants' statements were false or misleading when

---

Milak – would have understood Cohen's rejection of Milak's offer to mean that Acorda's financial troubles had suddenly and miraculously ceased to exist and relied on this understanding in purchasing additional shares.

[13] While "a district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction,'" *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)), 28 U.S.C. §1332 confers original jurisdiction over Plaintiffs' state claims, as the parties are diverse and the amount in controversy exceeds $75,000, (*see* TAC ¶¶ 4, 6-9).  The Court will therefore address the remaining state law claims despite the dismissal of Plaintiffs' federal claims.

made, that Defendants had the requisite scienter,[14] or that Plaintiffs reasonably relied on these statements.

The PSLRA safe harbor does not apply to Plaintiffs' state law claims, but like claims brought under the federal securities laws, fraud claims under New York law generally cannot be premised on "forward-looking statements of intent or expectations" unless the plaintiff can show that the defendant was aware at the time of making the statement that their prediction would not come to pass. *Kumaran v. Northland Energy Trading, LLC*, No. 19-CV-8345, 2025 WL 1982945, at \*9 (S.D.N.Y. July 9, 2025); *see Sharbat v. Iovance Biotherapeutics, Inc.*, No. 20-CV-1391, 2022 WL 45062, at \*10 (S.D.N.Y. Jan. 5, 2022) ("As is well settled under New York law, opinions of value or future expectations and forward-looking statements of opinion cannot support a claim for fraud."); *Pakter*, 931 F. Supp. 2d at 532 ("[P]rojections about anticipated revenue are the type of forward-looking statements that generally do not state a claim of fraud."). As discussed above, the only facts alleged in support of Plaintiffs' contention that Defendants' predictions about cash flow neutrality were insincere are that these predictions did not ultimately come to pass, which is not sufficient to allege fraud under the heightened pleading standards of

---

[14] While Rule 9(b) "allows malice, intent, knowledge, and other conditions of a person's mind to be alleged generally," *Gao v. Yang*, No. 20-CV-7285, 2022 WL 2193290, at \*2 (S.D.N.Y. June 17, 2022) – unlike the PSLRA, which "requires that a plaintiff plead with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 297 (S.D.N.Y. 2009) – state law fraud claims brought in federal court are still subject to Rule 9(b)'s requirement that plaintiffs allege "facts sufficient to support a strong inference of fraudulent intent," *JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 533 (S.D.N.Y. 2013); *see Davis v. Angelcare USA, LLC*, 727 F. Supp. 3d 99, 124 (D. Conn. 2024) ("Although a plaintiff may plead generally the requisite fraudulent intent, he must allege facts giving rise to a strong inference of fraudulent intent, which may include facts showing that the defendants had both motive and opportunity to commit fraud, or facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."). As discussed above, the allegations in the TAC are insufficient to raise the strong inference required under Rule 9(b).

Rule 9(b). *See Diesenhouse v. Soc. Learning & Payments, Inc.*, No. 20-CV-7436, 2022 WL 3100562, at *8 (S.D.N.Y. Aug. 3, 2022) (dismissing common law fraud claims based on forward-looking statements because "to hold otherwise would allow for unactionable falsity by hindsight"); *Cambridge Cap. LLC v. Ruby Has LLC*, No. 20-CV-11118, 2022 WL 2292817, at *5 (S.D.N.Y. June 24, 2022) (to the same effect); *see also Prime Mover Cap. Partners, L.P. v. Elixir Gaming Techs., Inc.*, 793 F. Supp. 2d 651, 672 (S.D.N.Y. 2011) ("While the federal statutory safe harbor for forward-looking statements does not itself protect such statements from common law fraud claims, essentially the same considerations – that is, the facts that (1) the statements were forward-looking statements of belief . . . , and (2) plaintiffs have alleged no facts, as opposed to conclusory assertions, showing that the defendants who made the statements did not believe them at the time – dictate dismissal here because the plaintiffs have not adequately alleged that these statements in fact were false."). Plaintiffs' state law fraud claims are therefore dismissed.

### C.    **Breach of Fiduciary Duty**

Plaintiffs also bring a claim for breach of fiduciary duty, arguing that Defendants "owed a fiduciary duty to Plaintiffs and other shareholders of Acorda" as corporate officers and "breached this fiduciary duty by knowingly and deliberately making the misrepresentations and omissions" described throughout the complaint. (TAC ¶ 61.) "Under New York law, a claim for breach of fiduciary duty requires (1) the existence of a fiduciary duty owed by the defendant; (2) a breach of that duty; and (3) resulting damages." *Spencer-Smith v. Ehrlich*, No. 23-CV-2652, 2024 WL 709291, at *6 (S.D.N.Y. Feb. 21, 2024).

"[A] fiduciary relation exists between two persons when one of them is under a duty to act or to give advice for the benefit of the other upon matters within the scope of the relation."

36

*Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 224 (S.D.N.Y. 2005); *see Meisel v. Grunberg*, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009) ("A fiduciary relationship requires great confidence and trust on the one part and a high degree of good faith on the other part.").  In support of their claims, Plaintiffs allege that "Defendants, Cohen and Gesser, as CEO and CFO respectively, owed a fiduciary duty to Plaintiffs and other shareholders of Acorda."  (TAC ¶ 61.) But "[a] corporate officer or director generally owes a fiduciary duty only to the corporation over which he exercises management authority."  *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 438 (S.D.N.Y. 2010); *see Lemgruber*, 385 F. Supp. 2d at 224.  Thus, "for a shareholder to successfully assert an independent cause of action arising from an independent duty, there must be a special relationship or agreement between the parties that is separate from their position in, or relationship through, the corporation."  *Kitzen v. Hancock*, No. 17-CV-6926, 2019 WL 612227, at *6 (E.D.N.Y. Jan. 29, 2019) (collecting cases), *report and recommendation adopted*, 2019 WL 591557 (E.D.N.Y. Feb. 13, 2019).[15]

And while Plaintiffs argue that "Cohen and Gesser cultivated a direct, trust-based relationship with Milak," (Ps' Opp. at 25), the allegations in the TAC show only that Milak, as a "diligent investor," (TAC ¶ 13), frequently communicated with Defendants to question them about the health of the company, not that he had placed "great confidence and trust" in Defendants and depended on them to advise him or act on his behalf.  The fact that Milak, in his capacity as a shareholder, checked in with Defendants, in their capacities as directors, to keep himself apprised of the company's well-being does not plausibly create an independent duty for

---

[15] While Plaintiffs state that "Defendants' denial that a fiduciary duty exists between them and Plaintiffs is contrary to binding New York law," (Ps' Opp. at 25), the case that they cite in support of this contention is inapposite, as *Giblin v. Murphy*, 73 N.Y.2d 769, 770-71 (1988), involved a closely held rather than public corporation and the defendants in that case did not contest the existence of a fiduciary duty.

37

Defendants to act for Plaintiffs' individual benefit.  Plaintiffs' fiduciary duty claim is therefore

dismissed.  *See In re Stillwater Cap. Partners Inc. Litig.*, 851 F. Supp. 2d 556, 573 (S.D.N.Y.

2012) ("Courts have held that corporate directors owe a fiduciary duty to shareholders where

there exists a 'special relationship,' such as holding themselves out as agents or when they are

shareholders, officers, and directors of a closely held corporation, but there is no precedent

finding such a 'special relationship' between a corporation and its shareholders."); *Prime Mover*

*Cap. Partners, L.P.*, 793 F. Supp. 2d at 670-71 (dismissing breach of fiduciary duty claim

against corporate officers and directors who allegedly made misleading statements because

individual shareholders failed to establish that fiduciary duty ran to them directly); *WIT Holding*

*Corp. v. Klein*, 724 N.Y.S.2d 66, 68 (App. Div. 2d Dep't 2001) ("[W]here the parties were

involved in an arms-length business transaction involving the transfer of stocks, and where all

were sophisticated business people, the plaintiff's cause of action to recover damages for breach

of fiduciary duty should have been dismissed.").

### D.    Negligent Misrepresentation

Plaintiffs' negligent misrepresentation claim also fails.  To state such a claim under New

York law, a plaintiff must allege that:

> (1) the defendant had a duty, as a result of a special relationship, to give correct
> information; (2) the defendant made a false representation that he or she should
> have known was incorrect; (3) the information supplied in the representation was
> known by the defendant to be desired by the plaintiff for a serious purpose; (4) the
> plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on
> it to his or her detriment.

*Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000); *see Maverick Fund,*

*L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 63 (E.D.N.Y. 2011).  Where, as here,

negligent misrepresentation claims sound in fraud, they are subject to the heightened pleading

requirements of Rule 9(b).  *See Welch v. TD Ameritrade Holding Corp.*, No. 07-CV-6904, 2009

38

WL 2356131, at *23 (S.D.N.Y. July 27, 2009); *Hampshire Equity Partners II, L.P. v. Teradyne, Inc.*, No. 04-CV-3318, 2005 WL 736217, at *2 (S.D.N.Y. Mar. 30, 2005), *aff'd*, 159 F. App'x 317 (2d Cir. 2005) (summary order).

As discussed above, the statements with which Plaintiffs take issue either were not false or misleading when made, do not support an inference of reasonable reliance, or both.  These deficiencies also doom the negligent misrepresentation claim, particularly given that the majority of the contested statements were forward-looking.  *See Hydro Invs.*, 227 F.3d at 20-21 (for purposes of a negligent misrepresentation claim, "the alleged misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition"); *Ng v. Sedgwick Glob. Inc.*, No. 23-CV-10380, 2025 WL 579972, at *6 (S.D.N.Y. Feb. 21, 2025) (to the same effect); *Maverick Fund*, 801 F. Supp. 2d at 64 ("There is no authority for the proposition that forward-looking statements may serve as the basis for a negligent misrepresentation claim under New York law."); *Welch*, 2009 WL 2356131, at *11 (dismissing negligent misrepresentation claims where "Plaintiff's allegations do not support an inference that he reasonably relied on any of Defendants' alleged misrepresentations"); *see also Sejin Precision Indus. Co. v. Citibank, N.A.*, No. 16-CV-6910, 2017 WL 4350323, at *9 (S.D.N.Y. June 28, 2017) ("For the reasons discussed above with regard to plaintiffs' fraud claims, plaintiffs have not sufficiently alleged the existence of actionable misrepresentations or omissions on which they reasonably relied, and therefore they cannot sustain their negligent misrepresentation claims."), *aff'd*, 726 F. App'x 27 (2d Cir. 2018) (summary order).  The negligent misrepresentation claims are therefore dismissed.

E.      **Civil Conspiracy**

Finally, Plaintiffs assert a claim of civil conspiracy. But "New York law only recognizes an action for civil conspiracy if it is connected to a separate underlying tort." *Fisk v. Letterman*, 424 F. Supp. 2d 670, 677 (S.D.N.Y. 2006); *see Filler v. Hanvit Bank*, 156 F. App'x 413, 418 (2d Cir. 2005) (summary order) ("A claim of conspiracy cannot stand alone and must be dismissed if the underlying independent tort has not been adequately pleaded."). Thus, where all of a plaintiff's other tort claims are dismissed, the civil conspiracy claim necessarily fails. *See Bottone v. Roche*, No. 22-CV-10349, 2024 WL 869552, at *4 (S.D.N.Y. Feb. 28, 2024); *Fisk*, 424 F. Supp. 2d at 677. Because none of Plaintiffs' other claims survive Defendants' motion, their civil conspiracy claim is dismissed as well.

IV.    **LEAVE TO AMEND**

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018). "Leave to amend, though liberally granted, may properly be denied" for "'repeated failure to cure deficiencies by amendments previously allowed'" or "'futility of amendment,'" among other reasons. *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiffs have already amended their complaint three times. (ECF Nos. 19, 38, 44.) When drafting the Second Amended Complaint, Plaintiffs had already been put on notice of the substance of Defendants' arguments via their first pre-motion letter, (ECF No. 32), and for the Third Amended Complaint, Plaintiffs had the benefit of both an additional pre-motion letter from Defendants, (ECF No. 39), and the discussion at the pre-motion conference, (*see* Minute Entry dated Feb. 14, 2025). In general, a plaintiff's failure to fix deficiencies in the previous pleading,

40

after being provided notice of them, is alone sufficient ground to deny leave to amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories *seriatim*."); *Williams v. Time Warner Inc.*, No. 09-CV-2962, 2010 WL 846970, at *7-8 (S.D.N.Y. Mar. 3, 2010) (leave to amend properly denied where plaintiff declines to amend after being advised of arguments for dismissal and complaint's deficiencies), *aff'd*, 440 F. App'x 7 (2d Cir. 2011); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.").

Moreover, Plaintiffs have not asked to amend again or otherwise suggested that they are in possession of facts that would cure the deficiencies identified in this decision. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if [he] fails to specify . . . how amendment would cure the pleading deficiencies in [the] complaint."); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice "in the absence of any indication that

41

[plaintiff] could—or would—provide additional allegations that might lead to a different result . . . ."); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004) (*per curiam*) (district court did not abuse its discretion by not granting leave to amend where there was no indication as to what might have been added to make complaint viable and plaintiffs did not request leave to amend); *GateGuard, Inc. v. Amazon.com Inc.*, No. 21-CV-9321, 2023 WL 2051739, at *21 (S.D.N.Y. Feb. 16, 2023) (denying leave to amend where plaintiff "already amended its complaint in response to [Defendant's] pre-motion letter detailing the bases for its anticipated motion to dismiss" and did not seek leave to amend again).

Accordingly, the Court declines to grant leave to amend *sua sponte*.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 48), and close the case.

**SO ORDERED.**

Dated:  December 2, 2025
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.